# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

---

ERICA EDWARDS,

     Plaintiff,                   File No. 1:24-CV-

v.                                 Hon.

DTN MANAGEMENT COMPANY
and RENTGROW, INC.,

     Defendants.

---

## COMPLAINT AND JURY DEMAND

---

### COMPLAINT

Now comes Plaintiff, Erica Edwards, by and through her attorneys, and states as follows:

### PARTIES AND JURISDICTION

1. Plaintiff, Erica Edwards, is a Black female who resides in Ingham County in the Western District of Michigan.

2. Defendant DTN Management Company (hereinafter, "DTN") is a Michigan corporation that regularly does business in Ingham County in the Western District of Michigan.

3. Defendant RentGrow, Inc. (hereinafter, "RentGrow") is a Delaware corporation that regularly does business in Ingham County in the Western District of Michigan.

4. This Court has subject matter jurisdiction based on 28 U.S.C. § 1331.

5. This Court may exercise supplemental jurisdiction over the state law claims asserted because they arise from a common nucleus of operative facts and are so related with the federal claims asserted as to form part of the same controversy under Article III of the U.S. Constitution, pursuant to 28 U.S.C. § 1367(a).

6. Venue in this district is proper under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this district.

## FACTUAL BACKGROUND

### Plaintiff's Application to Aspen Lakes Estates

7. DTN is a property management company that manages rental properties statewide, including approximately 80 complexes in the greater Lansing area. DTN manages Aspen Lakes Estates, which bills itself as a "luxury rental community" in Holt, Michigan.

8. On September 21, 2021, Ms. Edwards applied to be put on the waitlist for a unit at Aspen Lakes Estates.

9. On or around February 1, 2022, Ms. Edwards applied for an available unit at Aspen Lakes Estates.

10.    When she applied, Ms. Edwards was living in an apartment at Waverly Place, a complex also located in Holt.  Ms. Edwards's lease at Waverly Place ended in April 2022.

11.    Shortly after she completed her application at Aspen Lakes Estates, Ms. Edwards met with Austin England for a tour of the unit. Upon information and belief, Mr. England was employed by DTN and worked in the property management office at Aspen Lakes Estates.

12.    Mr. England appeared to look down on Ms. Edwards because she was living at Waverly Place, which was not a luxury apartment complex. In fact, Waverly Place had lower rents and a more racially diverse population than Aspen Lakes Estates.

13.    On February 4, 2022, Mr. England called Ms. Edwards and demanded additional documents as a part of her application, including a ledger from Waverly Place.  Ms. Edwards appropriately questioned the demand for a ledger, asking why she needed to provide a ledger when her rental history was clean. This escalated into an argument, and Mr. England told Ms. Edwards that she was acting "ghetto."

14.    Miriam-Webster's Dictionary defines "ghetto" as a quarter of a city in which members of a minority group live especially because of social, legal, or economic pressure. Colloquial use of this expression in the context that Mr. England used the word is a racially derogatory assertion about someone's behavior.

15.    Upon information and belief, Mr. England perceived Ms. Edwards as "ghetto" because she is a Black woman; lived in a lower-rent, racially diverse

apartment complex; and firmly challenged him as to why she was required to provide a ledger from Waverly Place.

16.     Ms. Edwards ultimately agreed to get Mr. England a ledger because he said that her application could not move forward without it.

17.     Ms. Edwards had previously explained to Mr. England that she had an agreement with Waverly Place to pay her rent into an escrow account until a bedbug infestation at the complex was resolved.  Shortly after their telephone call, Ms. Edwards sent Mr. England a copy of her ledger and the bank statements showing that she had deposited her rent into an escrow account each month.

18.     In addition to collecting documents from Ms. Edwards, Mr. England requested a tenant screening report from RentGrow.

19.     According to its website, RentGrow provides resident screening reports to property owners and managers, which may include an applicant's credit history, rental history, and other publicly reportable civil and criminal records.

20.     RentGrow completed a tenant screening report for Ms. Edwards on February 4, 2022.

21.     The top line of the tenant screening report from RentGrow stated: "Application Result: DECLINE."  (Ex. 1.) The report further stated that Ms. Edwards had a criminal history that did not meet Aspen Lakes Estates' requirements.  (Ex. 1.)

22.     Upon information and belief, RentGrow also generated a form letter for Aspen Lakes Estates to provide to Ms. Edwards stating that her application was

denied because she "did not meet the property's minimum rental requirements." (Ex. 2.) The letter went on to state: "Criminal History Does Not Meet Property Requirements." (Ex. 2.)

23.     In fact, Ms. Edwards's criminal history had been expunged. Prior to 2020, Ms. Edwards had an old conviction for carrying a concealed weapon. However, on November 4, 2020, the 30th Circuit Court entered an order expunging Ms. Edwards's conviction. Under Michigan law, once that order was entered, Ms. Edwards was "considered not to have been previously convicted." Mich. Comp. Laws § 780.622(1).

24.     After the court entered the order expunging Ms. Edwards's conviction, it sent the order to the Michigan State Police (MSP), as required by Mich. Comp. Laws § 780.623(1). On or around November 10, 2020, the MSP removed the expunged criminal conviction from Ms. Edwards's publicly available criminal record, including her record in the Internet Criminal History Access Tool (ICHAT).

25.     Law enforcement agencies, prosecutors, and courts in all of Michigan's counties are required to report felonies and serious misdemeanors punishable by more than 93 days to the MSP. The MSP uses these records to maintain the ICHAT, which allows for the search of public criminal history record information. ICHAT is the only public resource for name-based Michigan criminal history background checks.

26.     Upon information and belief, RentGrow did not run a background check through ICHAT. If it had, it would not have learned that Ms. Edwards did not

have a criminal history.  RentGrow's failure to check Ms. Edwards's name in ICHAT led it to report inaccurate information about Ms. Edwards's criminal history to Aspen Lakes Estates.

27.     By reporting the expunged conviction to Aspen Lakes Estates, RentGrow violated MCL 780.623(5), which makes it a misdemeanor for "any person other than the person whose conviction was set aside or a victim, who knows or should have known that a conviction was set aside" to "divulge[], use[], or publish[] information concerning a conviction set aside under [the Michigan expungement statute."

28.     Rentgrow's failure to utilize reasonable procedures to confirm the accuracy of Ms. Edwards's criminal history led it to provide an inaccurate report to Aspen Lakes Estates, which in turn led Aspen Lakes Estates to reject Ms. Edwards's application.

29.     By reporting the expunged conviction to Willoughby Estates, RentGrow violated MCL 780.623(5), which makes it a misdemeanor for "any person other than the person whose conviction was set aside or a victim, who knows or should have known that a conviction was set aside" to "divulge[], use[], or publish[] information concerning a conviction set aside under [the Michigan expungement statute]."

30.     Upon information and belief, Aspen Lakes Estates did not conduct an individualized assessment of Ms. Edwards's criminal history to whether it indicated that she would provide a risk to resident safety and/or property; rather, it simply

relied on RentGrow's erroneous conclusion that Ms. Edwards's application should be rejected.

31.     On or around February 5, 2022, Ms. Edwards called Mr. England to inquire about her application.  At the time she called, Ms. Edwards had not received the denial letter.

32.     Mr. England told Ms. Edwards that she was denied because she did not pass the background check.  When she pressed further, Mr. England told Ms. Edwards that her denial was because of a felony conviction.  Mr. England did not mention any other reason for Aspen Lakes Estates' decision to deny Ms. Edwards's application.

33.     Had Aspen Lakes Estates conducted an individualized assessment, it would have learned that Ms. Edwards did not have a criminal conviction.

34.     Following the entry of the order of expungement in 2020, Ms. Edwards believed that she had put the conviction behind her and could move forward with her life. When Ms. Edwards learned why her application had been denied, she experienced significant anxiety and depression, and she became concerned that she would not be able to find new housing due to her expunged conviction.

35.     Following her conversation with Mr. England, Ms. Edwards contacted Michelle Lasala, an area director for DTN. Ms. Lasala told Ms. Edwards that she should contact RentGrow directly about any errors on the tenant screening report.

36.     Shortly thereafter, Ms. Edwards contacted RentGrow and submitted a dispute form.

37.     On or around February 14, 2022, RentGrow corrected its screening report and removed the criminal conviction.  The updated screening report said that Ms. Edwards met the property requirements for criminal history. As such, the report concluded that the result of the screening was to accept Ms. Edwards.

38.     Upon information and belief, RentGrow sent its updated screening report to Aspen Lakes Estates as soon as it was completed.

39.     Ms. Edwards did not hear anything from Aspen Lakes Estates after the screening report was corrected.

40.     On March 31, 2022, Ms. Edwards reached out to Aspen Lakes Estates by email, saying that she was ready to move forward on leasing the unit.  Ms. Lasala responded to Ms. Edwards that her application was still denied.  Ms. Edwards asked why she was denied, but Ms. Lasala did not respond to Ms. Edwards's inquiry.

41.     Ms. Edwards did not hear from Aspen Lakes Estates again.

42.     Ms. Edwards was ultimately forced to move to an apartment outside the Holt school district, where she had been living for many years and where her son attended elementary school. Ms. Edwards knew the Holt school district well, since her older son had also attended schools there, and both she and her son felt comfortable being in that school district.

43.     Because she could not find housing in the Holt school district, Ms. Edwards was forced to move to an apartment in another district and her son had to

switch schools mid-year. Ms. Edwards and her son suffered emotional distress due to the move.

### DTN's Purported Rationale for Denying Plaintiff's Application

44.     Prior to filing this Complaint, the parties engaged in discussions about Ms. Edwards's claims.

45.     During those discussions, Ms. Edwards learned for the first time that the Social Security number on her application was incorrect.  It appears that Ms. Edwards accidentally put an additional digit into the middle of her social security number when filling out the online application, which resulted in the remaining digits being off.

46.     DTN now claims that it denied Ms. Edwards's application because she allegedly provided someone else's Social Security number. However, the fact that the social security number matched that in the payment stubs that she provided, except that there was an additional digit in the middle, should have alerted DTN to the error.

47.     No one at DTN ever told Ms. Edwards that her social Security number was wrong or that she was being denied because of that fact. Rather, she was told that she was denied because of her felony conviction.

48.     If Ms. Edwards had been told of the typo on her social security number, she would have corrected it.

49.     DTN also claims that it denied Ms. Edwards's application because she lied on the application when she stated "no" in response to the question of whether she had been convicted of a felony.

50.     Ms. Edwards did not lie about her criminal history; Michigan law is clear that once an expungement order is entered an individual "for purposes of the law, is considered not to have been previously convicted."  Mich. Comp. Laws § 780.622(1).

51.     Finally, DTN claims that it denied Ms. Edwards because she had a rental arrearage at Waverly Place. But Ms. Edwards informed Mr. England that she had an agreement with Waverly Place to put her rent into an escrow account and provided bank statements demonstrating that she had done so.

52.     DTN's post-hoc assertions that it denied Ms. Edwards for reasons other than her criminal history, and its view that she acted "ghetto," do not pass muster, and are merely a pretext for its illegal discriminatory reasons for denying Ms. Edwards housing opportunities.

## Racial Disparities and Criminal Convictions

53.     The Fair Housing Act and ELCRA prohibit facially neutral practices that have a disparate impact on the basis of race, unless they are necessary to achieve a substantial, legitimate, nondiscriminatory business interest that cannot be served through a less discriminatory alternative practice.

54.     In the United States, Blacks are incarcerated at a rate that is disproportionate to their population.  Blacks make up 38.5% of all inmates,[1] although they only make up 13.6% of the U.S. population.[2]

55.     There are significant racial disparities in the population-wide rate of incarceration. Nationwide, approximately 350 individuals are imprisoned per 100,000; however, the rate of Black individuals imprisoned is 4.8 times the rate of white individuals.[3]

56.     In Michigan, the disparity is even starker; the rate of Black individuals imprisoned is 6.7 times the rate of white individuals.[4]

57.     Racial disparities in the population of incarcerated individuals result in those same disparities among returning citizens looking to rebuild their lives with the burden of past criminal convictions.

58.     In April 2016, the U.S. Department of Housing and Urban Development (HUD) issued guidance confirming policies that create barriers to housing based on criminal records have a disproportionate adverse effect on Black individuals because of disparities in the criminal justice system.   *See* Exhibit 3, HUD, Office of Gen. Counsel Guidance on Application of FHA Standards to the Use of Criminal Records by Providers of Housing and Real Estate-Related Transactions

---

[1] See Federal Bureau of Prisons, Inmate Race (2023), https://www.bop.gov/about/statistics/statistics_inmate_race.jsp.

[2] See U.S. Census Bureau, Quickfacts: Race and Hispanic Origin (2022), https://www.census.gov/quickfacts/fact/table/US/RHI225217#RHI225217.

[3] See The Sentencing Project: U.S. Criminal Justice Data, https://www.sentencingproject.org/research/us-criminal-justice-data/?state=michigan

[4] See The Sentencing Project: U.S. Criminal Justice Data, https://www.sentencingproject.org/research/us-criminal-justice-data/?state=michigan

("HUD Guidance") (Apr. 4, 2016) at 2.  The HUD guidance cautioned that policies that ban persons with prior convictions are never necessary to achieve the potentially legitimate interest of protecting safety or property.  *Id.* at 6.  Policies that fail to account for the nature and severity of past crimes are unlikely to constitute policies that are necessary to serve a substantial, legitimate, nondiscriminatory interest, even if these policies do not ban all felony convictions. *Id.* at 7.

### Count 1:  Disparate impact race discrimination in violation of Fair Housing Act, 42 U.S.C. § 3604 (Defendant DTN)

59.    Plaintiff reaffirms all previous paragraphs.

60.    The Fair Housing Act prohibits discrimination in housing practices on the basis of protected class status, including race, under a theory of disparate impact. 42 U.S.C. § 3604; 24 CFR § 100.500.

61.    DTN's acts, policies, and practices regarding screening of tenant applicants with criminal convictions actually or predictably results in a disparate impact on Plaintiff and other Black applicants.

62.    DTN's policies are not necessary to achieve one or more substantial, legitimate, nondiscriminatory interests.

63.    Further, DTN's interests could be served by other policies or practices that have a less discriminatory effect on Plaintiff and other Black applicants.

64.    Accordingly, DTN's overly restrictive tenant screening policies related to criminal convictions constitute a practice which has caused an adverse impact on Plaintiff and others based on race, in violation of 42 U.S.C. § 3604 and 24 C.F.R. §

100.500, because they actually or predictably result in a disparate impact on the basis of race.

<u>Count 2:  Disparate treatment on the basis of race in violation of Fair Housing Act, 42 U.S.C. § 3604 (Defendant DTN)</u>

65.    Plaintiff reaffirms all previous paragraphs.

66.    The Fair Housing Act prohibits discrimination in housing practices on the basis of protected class status, including race. 42 U.S.C. § 3604.

67.    Upon information and belief, DTN has established policies regarding criminal convictions that are intended to result in a tenant population that is disproportionately white and excludes many potential Black tenants.

68.    Upon information and belief, DTN's decision to deny admission to Plaintiff was based on both her criminal conviction, even though it had been expunged, and its impression that she was "ghetto," and undesirable as a tenant, based at least in part on her race as a Black woman.

69.    Upon information and belief, DTN applied its screening criteria more aggressively for Plaintiff than it has for other than applicants who are white.

70.    Upon information and belief, DTN's asserted reasons for denying Plaintiff's application for tenancy are a pretext for its actual discriminatory reasons.

71.    Accordingly, DTN has treated Plaintiff differently by making housing unavailable on the basis of race, in violation of 42 U.S.C. § 3604.

<u>Count 3:  Disparate impact race discrimination in violation of the Elliott-Larson Civil Rights Act (Defendant DTN)</u>

72.    Plaintiff reaffirms all previous paragraphs.

73.     The Elliott-Larson Civil Rights Act ("ELCRA") prohibits discrimination in a variety of contexts, including housing on the basis of race, under a theory of disparate impact. Mich. Comp. Laws § 37.2502.

74.     DTN's acts, policies, and practices regarding screening of tenant applicants with criminal convictions actually or predictably results in a disparate impact on Plaintiff and other Black applicants.

75.     DTN's policies are not necessary to achieve one or more substantial, legitimate, nondiscriminatory interests.

76.     Further, DTN's interests could be served by other policies or practices that have a less discriminatory effect on Plaintiff and other Black applicants.

77.     Accordingly, DTN's overly restrictive tenant screening policies related to criminal convictions constitute a practice which has caused an adverse impact on Plaintiff and others based on race, in violation of ELCRA, because they actually or predictably result in a disparate impact on the basis of race.

### Count 4:  Disparate treatment race discrimination in violation of ELCRA (Defendant DTN)

78.     Plaintiff reaffirms all previous paragraphs.

79.     ELCRA prohibits discrimination in a variety of contexts, including housing on the basis of race. Mich. Comp. Laws § 37.2502.

80.     Upon information and belief, DTN has established policies regarding criminal convictions that are intended to result in a tenant population that is disproportionately white and excludes many potential Black tenants.

14

81.   Upon information and belief, DTN's decision to deny admission to Plaintiff was based on both her criminal conviction, even though it had been expunged, and its impression that she was "ghetto," and undesirable as a tenant, based at least in part on her race as a Black woman.

82.   Upon information and belief, DTN applied its tenant screening criteria more aggressively for Plaintiff than it has for other than applicants who are white.

83.   Upon information and belief, DTN's asserted reasons for denying Plaintiff's application for tenancy are a pretext for its actual discriminatory reasons.

84.   Accordingly, DTN has treated Plaintiff differently by making housing unavailable on the basis of race, in violation of Mich. Comp. Laws § 37.2502.

## Count 5:  Violation of the Fair Credit Reporting Act (FCRA), 15 U.S.C. § 1681 *et seq.* (Defendant RentGrow)

85.   Plaintiff reaffirms all previous paragraphs.

86.   Under the FCRA, a consumer reporting agency must "adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information." 15 U.S.C. § 1681(b).

87.   When preparing a report, a consumer agency "shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."  15 U.S.C. § 1681e.

88.   RentGrow does not follow reasonable procedures for ensuring the accuracy of criminal background information.

89.     RentGrow willfully failed to comply with the FCRA's requirements to follow reasonable procedures to assure accuracy of Ms. Edwards's criminal history report before providing it to DTN.  15 U.S.C. § 1681n.

90.     In the alternative, RentGrow negligently failed to comply with the FCRA's requirements to follow reasonable procedures to assure accuracy of Ms. Edwards's criminal history report before providing it to DTN.  15 U.S.C. § 1681o.

## REQUESTED RELIEF

Plaintiff respectfully requests that this Court grant it the following relief:

a. Enter a declaratory judgment finding that Defendant DTN's policy and practices violate the Fair Housing Act and ELCRA;

b. Enter a permanent injunction enjoining Defendant DTN from enforcing its current policy and practices regarding screening for criminal convictions and directing Defendant to establish new policy and practices that are consistent with the Fair Housing Act, the HUD Guidance, and ELCRA;

c. Award economic and non-economic damages to Plaintiff;

d. Award punitive damages to Plaintiff;

e. Award Plaintiff its reasonable attorney's fees and costs under 42 U.S.C. § 3613(c)(2), Mich. Comp. Laws § 37.2502, 15 U.S.C. § 1681n and 15 U.S.C. § 1681o;

f. Award prejudgment interest to Plaintiff; and

g. Order such other relief as the Court deems just and equitable.

PINSKY SMITH, PC
Attorneys for Plaintiff


Dated: January 26, 2024　　　By:　　/s/ Sarah R. Howard
　　　　　　　　　　　　　　　　Sarah Riley Howard
　　　　　　　　　　　　　　　　Crystal Bultje
　　　　　　　　　　　　　　　　Elizabeth L. Geary
　　　　　　　　　　　　　　　　146 Monroe Center St NW, Suite 418
　　　　　　　　　　　　　　　　Grand Rapids, MI 49503
　　　　　　　　　　　　　　　　(616) 451-8496
　　　　　　　　　　　　　　　　showard@pinskysmith.com


## JURY DEMAND

Plaintiff demands a trial by jury.


PINSKY SMITH, PC
Attorneys for Plaintiff


Dated: January 26, 2024　　　By:　　/s/ Sarah R. Howard
　　　　　　　　　　　　　　　　Sarah Riley Howard
　　　　　　　　　　　　　　　　Crystal Bultje
　　　　　　　　　　　　　　　　Elizabeth L. Geary
　　　　　　　　　　　　　　　　146 Monroe Center St NW, Suite 418
　　　　　　　　　　　　　　　　Grand Rapids, MI 49503
　　　　　　　　　　　　　　　　(616) 451-8496
　　　　　　　　　　　　　　　　showard@pinskysmith.com